### In re ADOPTION OF J.M.
### d/o/b May 28, 2006.

### Appeal of J.A.M.

Superior Court of Pennsylvania.

Argued Sept. 22, 2009.

Filed March 5, 2010.

Toni M. Cherry, DuBois, for appellant.

BEFORE: FORD ELLIOTT, P.J., ORIE MELVIN * and BENDER, JJ.

OPINION BY BENDER, J.:

¶ 1 J.A.M. ("Mother") appeals from the decree entered on December 22, 2008, wherein the trial court denied her petition to involuntarily terminate J.D.'s ("Father") parental rights to their daughter, J.M., pursuant to the Adoption Act, 23 Pa.C.S. § 2511. We reverse the decree and remand with instructions.

* Judge Orie Melvin did not participate in the consideration or decision of this case.

¶ 2 The trial court succinctly summarized the relevant facts and procedural history as follows:

[Mother] and [Father] are the natural parents of [J.M.], age 2, born May 28, 2006. [A.M. ("Maternal Grandfather")] is the maternal grandfather of the child. [Mother] and [Father] never married and did not co-habit during any period of their daughter's life and [Father] had at best transitory contact with the child. After an extended period of [Father's] marginal involvement, on May 15, 2008, [Mother and Maternal Grandfather] filed a petition pursuant to 23 Pa.C.S.A. [§] 251[1] seeking to involuntarily terminate [Father's] parental rights under the auspices of having the child adopted by [Maternal Grandfather], with whom the child . . . has never lived.[1]

. . . .

After the May 15, 2008 filing of the involuntary termination petition, a hearing on the petition was scheduled on July 15, 2008, and Attorney Nathaniel Schmidt was appointed by the Court to represent the interests of the child by Order dated May 21, 2008. On July 15, 2008, Attorney Damion J. Beaver entered his appearance on behalf of [Father] and orally moved the Court to continue the hearing that date. Given the interests involved, the Court granted the motion and continued the hearing to September 9, 2008. Following the hearing . . ., counsel were granted the opportunity to submit proposed findings and legal memorandums to the Court, after the receipt of which the Court entered its findings of fact, memorandum opinion, conclusions of law and Order of Court on December 22, 2008, by which the petition was denied.

Appellants filed a timely notice of appeal on January 21, 2009, and a timely concise statement of errors complained [of on appeal] on February 12, 2009, incident to a Pa.R.A.P. 1925(b) order issued by the Court on January 22, 2009. The transcript of the September 9, 2008 hearing was then filed of record on March 12, 2009.

Trial Court Opinion ("T.C.O."), 4/6/09, at 1–2.

¶ 3 On appeal, Mother raises one question for our review: "Whether the trial court's conclusion[,] that the termination of Father's parental rights did not serve the best interests of the minor child[,] was supported by competent evidence?" Mother's brief at 4.

¶ 4 Our standard of review regarding orders involving the involuntary termination of parental rights is limited to the determination of whether the trial court's order is supported by competent evidence. *In re Z.S.W.*, 946 A.2d 726, 728 (Pa.Super.2008). We have explained this consideration as follows:

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the rec-

---

1. Although the trial court failed to determine whether Maternal Grandfather had standing pursuant to section 2512, we observe that any error in permitting Maternal Grandfather to join Mother's petition was harmless. *See In re Adoption of J.F.*, 392 Pa.Super. 39, 572 A.2d 223 (1990) (while wife of child's natural father was not proper party to petition for involuntary termination of natural mother's parental rights, mother was not prejudiced by error as father was proper petitioning party and could have advanced petition without his wife).

ord in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005). In such cases, the burden is upon the petitioning party to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid.

¶ 5 We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003).

¶ 6 Requests to terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511. Herein, Mother sought to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b), which provide in pertinent part as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

¶ 7 This Court applies a two-part test for termination of parental rights. In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007), we stated:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

¶ 8 In denying Mother's petition, the trial court conceded that Mother established the statutory grounds to involuntary terminate Father's parental rights pursuant to subsection 2511(a)(1); however, it did not believe that termination was in

J.M.'s best interest pursuant to subsection 2511(b). The trial court reasoned that Mother did not present clear and convincing evidence that terminating Father's parental rights, in order to facilitate J.M.'s intended adoption by Maternal Grandfather, was in the child's best interest. As the statutory grounds are conceded as to subsection (a), Mother's appeal implicates only the trial court's needs and welfare analysis.

¶ 9 Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super.2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa.Super.2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

■ ¶ 10 The crux of Mother's complaint is that, contrary to the trial court's conclusion, the competent evidence of record warrants the involuntary termination of Father's parental rights. Mother argues that she presented clear and convincing evidence that no bond exists between Father and his then two-year-old child, and that Father's stated desire to bond with J.M. in the future is at best speculative. Upon our thorough review of the record, we agree with both contentions.

¶ 11 During the evidentiary hearing, Mother testified that J.M. does not know Father and the child fears him as she would fear any other stranger. N.T., 9/9/08, at 89. Father ended his relationship with Mother soon after she discovered her pregnancy. *Id* at 36–37. When Mother contacted Father to advise him of the child's birth, he hung up the telephone. *Id.* at 6. Although Mother arranged for Father to visit with J.M., Father failed to appear three different times. *Id.* at 7–9. Likewise, Father failed to attend the child's baptism. *Id.* at 11. Indeed, Father's total interaction with J.M. consists of one birthday card and a single one-hour visit with the child that occurred in a Wal-Mart parking lot during November of 2007, when the child was eighteen months old. *Id.* at 12, 14, 65. Similarly, Mother testified that prior to the date she filed the petition to involuntarily terminate Father's rights, he never sent J.M. any gifts nor contacted Mother to inquire of the child's needs and welfare. *Id.* at 16. Mother further explained that Father's extended absence from J.M.'s life confused the child, who has no idea who her father is. *Id.* at 33–34.

¶ 12 In contrast to Father's unmitigated parental inaction, Maternal Grandfather is J.M.'s *de facto* parent. Mother testified that Maternal Grandfather provides daily support for J.M., and he has performed the parental duties of a Father since the child's birth. *Id.* at 23–24. Similarly, Maternal Grandfather testified that he interacts with J.M. for two to four hours every weekday and interacts with the child more on weekends. *Id.* at 40. He spends as much time with the child as possible, he loves her, and his primary concern is her well being. *Id.* at 43–44. When Maternal Grandfather is working, his wife cares for J.M. in Maternal Grandfather's home. *Id.* at 47. Maternal Grandfather also provides for the child financially, and he testified

that he would be able to continue to provide for her if he were permitted to proceed to adoption. *Id.* at 42, 43. He firmly believes that J.M. needs the support of a father figure, and he desires to fill the void created by Father's inaction. *Id.* at 42, 44.

¶ 13 The foregoing testimony demonstrates that no bond exists between Father and J.M. If a father-daughter bond exists in this case, it is between J.M. and Maternal Grandfather. Hence, terminating Father's parental rights would not harm the child's developmental, physical, and emotional needs and welfare.

¶ 14 Recognizing the lack of a parent-child bond between Father and J.M., the trial court focused its needs and welfare analysis on Father's stated hope to form a bond with the child in the future. Specifically, the trial court found "[Father's] testimony regarding his desire and willingness to assume an active role as the child's parent to be sincere and credible." T.C.O., 4/6/09, at 3. The trial court reasoned that this Court must defer to the findings of the trial judge on issues of credibility, and highlighted Father's testimony concerning his newfound ability and desire to satisfy his parental obligations. *Id.* (citing N.T., 9/9/08, at 53, 54, 71). While we agree with the trial court's statement concerning the deference appellate courts grant to a trial court's credibility determination, Father's credibility is not at issue in this case. Rather, the issue is Father's continued failure to perform his parental duties. Father's promise to be a better parent in the future, though believed by the trial court to be sincere, does not change the facts that (1) no bond presently exists between Father and J.M. and (2) Father's parenting failures have had a detrimental effect upon J.M.'s developmental and emotional needs and welfare.

¶ 15 Section 2511(b) requires the trial court to determine what effect breaking an existing parent-child bond will have on the child currently, not speculating whether a bond may be formed in the future. As a panel of this Court noted: "The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.,* 901 A.2d 502, 513 (Pa.Super.2006). Although we made this statement in regard to the section 2511(a)(8) analysis in *R.J.S.,* we find the statement pertinent to the instant case as a whole. As previously discussed, J.M. is confused by Father's absence, and even though she strongly desires an identifiable father figure in her life, she does not recognize Father as her parent. If we were to permit Father further opportunity to bond with J.M., we would be subjecting the child, who has been waiting for more than two years for an identifiable father figure, to a state of proverbial limbo in anticipation of a scenario that is speculative at best. Thus, notwithstanding the trial court's credibility determination regarding Father's decision to finally assume his parenting duties, the competent evidence of record demonstrates that terminating Father's parental rights would best serve J.M.'s developmental, physical, and emotional needs and welfare.

¶ 16 Interspersed throughout its needs and welfare analysis, the trial court made factual findings that the adoption contemplated by Maternal Grandfather was not in J.M.'s best interest because it would not create a traditional, nuclear family. Essentially, the trial court considered cohabitation to be the *sine qua non* of the family unit. Specifically, the court reasoned, "no new family unit would result given that [Mother and Maternal Grandfather] have maintained completely separate households since the child's birth and [Maternal Grandfather] has never maintained physi-

cal custody of [J.M.]." T.C.O., 9/9/08, at 3. The trial court continued, although Mother seeks to fashion a formal parental relationship between Maternal Grandfather and J.M., she did not present evidence that a formal relationship was in the child's best interest or that J.M. considered Maternal Grandfather to be her father rather than her grandfather.

■ ¶ 17 Without addressing whether the record supports the trial court's factual findings, we first must confront whether prevailing Pennsylvania law permits Maternal Grandfather to formally step into the void Father created. Adoption in Pennsylvania is purely a creature of statute, with no roots in common law. *In re Carroll's Estate*, 219 Pa. 440, 68 A. 1038 (1908). *In re Adoption of D.*, 769 A.2d 508, 509 (Pa.Super.2001). The provisions of the Act must be complied with and strictly construed. *See In re Adoption of Gunther*, 416 Pa. 237, 206 A.2d 61 (1965).

¶ 18 In *In re Adoption of K.M.W.*, 718 A.2d 332 (Pa.Super.1998), this Court held that a grandmother was not permitted to adopt her minor grandchild where the child's mother intended to retain her parental rights. We reasoned that under section 2903 of the Adoption Act, "whenever a parent consents to the adoption of his child by his spouse, the parent-child relationship between him and the child shall remain whether or not he is one of the petitioners in the adoption proceeding." *Id.* at 333. We concluded that the statute "envisioned a narrow case where one parent would retain parental rights and another party would be allowed to adopt. Clearly, the other party must be the spouse of the parent retaining parental rights." *Id.* at 334.

¶ 19 However, *In re Adoption of R.B.F.*, 569 Pa. 269, 803 A.2d 1195, 1202 (2002), our Supreme Court subsequently read section 2901 of the Adoption Act to permit a non-spouse to adopt a child where one of the child's natural parents continues to retain custody "upon good cause shown." [2] *In re R.B.F.* involved two companion cases wherein the same-sex partners of the respective natural parents sought to formalize their parental relationship with the natural parents' children. The trial courts denied the petitions based on section 2903 because, in each case, the adopting party was not the spouse of the parent retaining parental rights.

¶ 20 In reversing the trial courts' determinations, our Supreme Court stated,

> After careful consideration, we agree with Appellants that there is no reasonable construction of the Section 2901 "cause shown" language other than to conclude that it permits a petitioner to demonstrate why, in a particular case, he or she cannot meet the statutory requirements. Upon a showing of cause, the trial court is afforded discretion to determine whether the adoption petition should, nevertheless, be granted. The exercise of such discretion does not open the door to unlimited adoptions by legally unrelated adults.

*Id.* at 1201–02. The Supreme Court remanded the cases to the trial courts to allow the respective petitioners to show cause why the adoptions should proceed without the termination of the rights of the respective natural parents. While the Supreme Court's decision in *R.B.F.* was rendered in the context of unmarried same-sex partners and not grandparents, we believe the same principle applies to the case at bar.

---

**2.** Section 2901 provides, in pertinent part, "Unless the court for cause shown determines otherwise, no decree of adoption shall be entered unless the natural parent or parents' rights have been terminated[.]"

¶ 21 Although portions of the trial court's needs and welfare analysis touch upon this issue, the trial court never directly considered whether Mother was able to show cause to proceed with the adoption as our Supreme Court contemplated in *R.B.F.* Thus, having found clear and convincing evidence that the involuntary termination of Father's parental rights is warranted pursuant to subsection 2511(a) and that severing Father's parental rights would best serve J.M.'s developmental, physical, and emotional needs and welfare under subsection 2511(b), we reverse the decree denying Mother's petition to the extent that it refused to order the termination of Father's parental rights. However, we remand the matter for the trial court to permit Mother to show cause pursuant to section 2901 of the Adoption Act why the proposed adoption should proceed.

¶ 22 Decree reversed. Matter remanded for further proceedings. Jurisdiction relinquished.